**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  09-60304-CR-MOORE/SIMONTON**

**UNITED STATES,**

      **Plaintiff,**

**v.**

**CHARLES THERION CLAYTON,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

Presently pending before the Court are Defendant's Motion to Compel, in which Defendant Charles Therion Clayton, *pro se*, seeks to vacate his guilty plea (DE # 43) and Defendant Charles Therion Clayton's Motion To Withdraw Guilty Plea and Request for Evidentiary Hearing, which was filed by counsel and which incorporated the grounds alleged in the *pro se* motion (DE # 63).  These motions are referred to the undersigned Magistrate Judge (DE # 44).  The government has responded in opposition (DE # 50).  On May 4, 2010, an evidentiary hearing was held on the motions.  For the reasons set forth below, it is hereby recommended that the Motions be denied.

    **I.  BACKGROUND**

Defendant, Charles Therion Clayton, is charged with one count of possessing with the intent to distribute more than five hundred (500) grams of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. 841(a)(1) and b(1)(B)(ii) (DE # 8).  Defendant was arrested and initially appeared in court on October 21, 2009 (DE ## 1-4).  At that time, the Federal Public Defender was appointed as Defendant's attorney and Assistant Federal Public Defender Daryl Wilcox was assigned to the case (DE ## 4-5).  On November 3, 2009, the indictment mentioned above was

returned (DE # 8).  Defendant was arraigned on November 4, 2009 (DE ## 11, 12).  Also on November 4, 2009, the District Court set a calendar call for December 30, 2009, and a trial date of January 4, 2010 (DE # 10).

On November 9, 2009, AFPD Vincent Farina was substituted for AFPD Daryl Wilcox (DE # 15).  On December 21, 2009, AFPD Farina filed an unopposed motion to withdraw as Defendant's attorney, citing irreconcilable differences and Defendant's lack of faith in AFPD Farina's ability to represent him.  AFPD Farina also noted that Defendant had a career offender status and was facing a significant period of incarceration if convicted  (DE # 17).  On December 23, 2009, the undersigned held a hearing on AFPD Farina's counsel's motion to withdraw, granted the motion, and appointed Philip Horowitz, Esq. as Defendant's counsel (DE ## 19, 27).

On December 24, 2009, attorney Horowitz filed a motion to continue the trial until the next trial period (DE # 20), which the District Court granted in part on December 30, 2009, continuing the trial until January 11, 2010 (DE # 21).  On January 8, 2010, attorney Horowitz filed a motion to exclude Fed.R.Evid. 404(b) evidence (DE # 30).  The government responded in opposition on January 9, 2010 (DE # 34), and the District Court denied the motion on January 11, 2010 (DE # 37).  On January 9, 2010, the government filed a notice of intent to seek enhanced penalties, pursuant to 21 U.S.C. § 851 (DE # 33).  On January 10, 2010, Defendant filed proposed jury instructions (DE # 36), and a motion in limine (DE # 35), which the District Court denied on January 11, 2010 (DE # 37).

On January 11, 2010, Defendant appeared in court to begin his jury trial.  A jury panel was waiting.  At that time, Defendant decided to and did plead guilty (DE # 38), also signing a plea agreement (DE # 40).  The District Court set Defendant's sentencing

2

for March 30, 2010 (DE # 39).[1]

On March 5, 2010, Defendant filed a pro se motion to compel, in which he sought to vacate his guilty plea, in which he stated that: 1) he had only the education and comprehension of a third grader; 2) he was ill-advised of the consequences of his plea; 3) he was denied a speedy trial; 4) he did not receive the discovery which he had repeatedly requested; 5) he was tricked into making a post-arrest incriminating statement without advice of counsel; 6) he was unaware that the parcel he signed for contained cocaine; 6) he was misled into signing for delivery of the parcel; 7) he objected to his upward departure (his career offender status); 8) the upward departure provisions of the sentencing guidelines were never explained to him; 9) he unwittingly and unknowingly waived his right to appeal his sentence; and 10) he received insufficient counsel (DE # 43).  On March 16, 2010, the government filed a response in opposition (DE # 50).

On March 17, 2010, the undersigned held a status conference on Defendant's motion, and granted it, to the extent that Defendant sought substitute counsel; appointed Manuel Vasquez, Esq. as substitute counsel; and deferred a ruling on the merits of Defendant's motion (DE ## 52, 53).  On March 24, 2010, the undersigned held a further status conference on Defendant's motion, and, on the joint request of  Defendant and attorney Vasquez, vacated attorney Vasquez's appointment, and appointed Michael G. Smith as substitute counsel (DE ## 54-56).  On March 30, 2010, the undersigned held a further status conference on Defendant's motion, and attorney Smith indicated that

---

[1] Defendant's sentencing has since been rescheduled to June 29, 2010 (DE # 75). On May 12, 2010, Defendant, through counsel, filed a sentencing memorandum (DE # 70) and objections to the PSI (DE # 69).

3

Defendant would be proceeding with his motion to withdraw his guilty plea (DE # 62).

On April 12, 2010, Defendant, through counsel, filed a motion to withdraw guilty plea and request for evidentiary hearing, in which he alleged that his attorney failed to render him effective assistance by failing to: 1) adequately review his case and the defense with Defendant; 2) spend adequate time with the incarcerated Defendant, in order to counsel and advise him regarding the facts and law of the case;  3) properly advise Defendant of advantages and disadvantage of pleading guilty, as opposed to being found guilty after a trial; 4) provide and adequately review discovery with Defendant; 5) conduct a defense investigation; 6) move to suppress any post-arrest statement made by Defendant; 7) meet with Defendant during the weekend just days before trial; 8) adequately explain the potential application of the advisory sentencing guidelines and the career criminal enhancement as they might apply to Defendant; and 9) review the plea colloquy with Defendant or otherwise discuss or prepare Defendant for any plea proceedings (DE # 63 at 2-3, para. 4).[2]  This motion incorporated the grounds for relief set forth in Defendant's March 5, 2010 pro se motion (DE # 63 at 4, para. 8).

On May 4, 2010, the undersigned held an evidentiary hearing on Defendant's motion to withdraw his guilty plea (DE # 67).

## II.  THE LEGAL STANDARD TO DETERMINE WHETHER TO PERMIT WITHDRAWAL OF A GUILTY PLEA

Fed.R.Crim.P. Rule 32(e), which governs the circumstances under which a defendant may be permitted to withdraw his guilty plea, provides that "the court may permit the plea to be withdrawn if the defendant shows any fair and just reason."  In

---

[2] On April 20, 2010, Defendant, pro se, filed a motion to dismiss the indictment (DE # 64).  On May 17, 2010, Defendant, pro se, filed a motion to suppress (DE # 71).

*United States v. Buckles*, 843 F.2d 469, 472 (11th Cir. 1988), the Eleventh Circuit held that

the determination of whether there is a "fair and just reason" is based on the totality of

the circumstances, including the following factors:

> (1) whether close assistance of counsel was available; (2)
> whether the plea was knowing and voluntary; (3) whether
> judicial resources would be conserved; and (4) whether the
> government would be prejudiced if the defendant were allowed
> to withdraw his plea.  The good faith, credibility and weight of
> a defendant's assertions in support of a motion under Rule
> 32(d) [now renumbered as 32(e)] are issues for the trial court to
> decide.

The court noted that there is no need to inquire into the prejudice to the government

unless the defendant first demonstrates a good reason for withdrawal.  *Id.* at 472 n. 3.  In

*Buckles*, the defendant claimed that he should be permitted to withdraw his plea of

guilty because it was the result of duress caused by his counsel's insistence that he

plead guilty and by his mental impairment caused by drugs he was taking due to a

respiratory infection and high fever, also claiming that he was innocent and that he had

not wanted to plead guilty.  The District Court denied the motion, finding that: the duress

claim lacked credence; and Buckles had decided to plead guilty prior to the plea hearing

and, therefore, any mental impairment at the time of the hearing did not affect his

decision.  The Eleventh Circuit affirmed, recognizing that a "mere declaration of

innocence does not entitle a defendant to withdraw his guilty plea.... Guilty pleas would

be of little value to the judicial system if a defendant's later conclusory assertion of

innocence automatically negated his plea."  *Id.* at 472-73.  *Accord United States v. Najjar*,

283 F.3d 1306 (11th Cir. 2002); *United States v. Rogers*, 848 F.2d 166 (11th Cir. 1988);

*United States v. Gonzalez-Mercado*, 808 F.2d 796 (11th Cir. 1987); *see also United States*

*v. Hyde*, 520 U.S. 670, 676-77 (1997) (emphasizing that permitting a defendant to

5

withdraw his plea without making the required showing "debases the judicial proceeding at which a defendant pleads and the court accepts his plea").

### III. The May 4, 2010 Evidentiary Hearing

At the May 4, 2010 evidentiary hearing, the Defendant testified on his own behalf. The government called as witnesses attorneys Farina and Horowitz, and introduced into evidence: a letter dated November 17, 2009 from AFPD Farina to Defendant (DE # 68, Ex. 1); a letter dated December 16, 2009 from AFPD Farina to Defendant (DE # 68, Ex. 2) and the transcript of the December 23, 2009 hearing on AFPD Farina's motion to withdraw (DE # 68, Ex. 3). The government also relied upon transcript of hearings held by the undersigned on March 17, 2010 and March 24, 2010, and the transcript of Defendant's January 11, 2010 plea colloquy, all of which had previously been filed with the Court (DE ## 48, 58, 59).

### A. Defendant's Testimony

At the evidentiary hearing, Defendant testified that he went to school through the eighth grade, and knows how to read a little bit and how to write a little bit. He believes that almost fifteen years ago he was evaluated at a third grade reading level.

### 1. Defendant's Representation By AFPD Farina

Defendant claimed that he had met with AFPD Farina twice, for two or three minutes at a time, and that Farina also met with other clients when he came to see Defendant. Farina told Defendant he was going to file a motion to suppress the arrest and the evidence. Defendant claimed that Farina did not discuss trial strategy with him and did not discuss with him the discovery materials provided by the government, but just sent the discovery to Defendant in the mail. Defendant testified that he looked over the discovery a little, but did not understand it.

6

Defendant further testified that AFPD Farina told him that he was facing a Level 34 at a Criminal History of VI on the sentencing guidelines. Defendant thought that his charge was a Level 26. Defendant claimed that Farina never discussed the guidelines with him, but just gave him a copy of the guidelines chart with a letter attached. Defendant testified that he did not remember receiving a six-page document from Farina, consisting of a letter dated November 17, 2009 and sentencing guidelines materials. Defendant did remember receiving a two-page letter from Farina dated December 16, 2009 in which Farina told Defendant that he was not an armed career criminal, but he was a career offender, and could expect a sentence of approximately 188 months. *See* Exhibit 2. Defendant testified that Farina never reviewed Exhibit 2 with him.

Defendant said that he had wanted AFPD Farina removed as his attorney because Defendant did not and does not agree that he is a career offender. Defendant testified that he remembered the undersigned Magistrate Judge explaining to him, at the December 23, 2009 hearing on substituting counsel, the difference between a career offender and an armed career criminal. Defendant also testified at the evidentiary hearing that he understood that he was a career offender, but also testified that he did not qualify for a Section 851 enhancement.

Defendant testified that another inmate had helped him with the sentencing guidelines, and had been helping him all along.

2. <u>Defendant's Representation By Attorney Horowitz</u>

Defendant claimed that attorney Horowitz was appointed as his counsel in December 2009, and that Horowitz met with him at FDC four or five times, but never for very long. Defendant further testified that Horowitz talked about preparing for trial, but didn't tell Defendant anything about the strategy he intended to use. Defendant claimed

7

that he wanted Horowitz to file a motion to suppress, just as he had asked AFPD Farina to do.

Defendant testified that the first time he met with attorney Horowitz was in late December, and that they met for ten or fifteen minutes.  At this meeting, Horowitz told Defendant that the offense level for his charge was 26, with a minimum sentence of five years, but Horowitz did not discuss with Defendant the facts of the case or any defenses.

Defendant further testified that the second time he met with attorney Horowitz, he was told that the government wanted to enhance Defendant to Level 34, and that Defendant had two qualifying convictions that made him an Armed Career Criminal. Defendant claims that Horowitz didn't explain that to him, but stated only that was what the prosecutor wanted.  Horowitz didn't discuss with Defendant whether to enter a guilty plea or go to trial, but just said that Defendant was going to trial on January 4, 2010. Defendant said that this meeting also lasted for ten to fifteen minutes.

Defendant admitted that he did not ask attorney Horowitz to file a motion to suppress and never discussed it with him; and Defendant claimed that Horowitz filed motions which he had never discussed with Defendant.

Defendant did not remember if he had met with attorney Horowitz on the weekend before the trial was to begin, *i.e.,* the weekend of January 9, 2010.

On January 13, 2010, two days after Defendant entered his guilty plea, he was debriefed by the Postal Service and by the DEA.  Attorney Horowitz and an Assistant United States Attorney were also present.  At the debriefing, Defendant admitted that he worked for Dread, a drug dealer in his neighborhood.

Subsequently, at Defendant's third meeting with attorney Horowitz, Horowitz

8

brought a copy of Defendant's motion to compel, in which Defendant sought to vacate his guilty plea.  The meeting lasted for ten to fifteen minutes.  Defendant claimed that attorney Horowitz showed him a notice of enhancement after Defendant filed his motion to compel, in which Defendant sought to vacate his guilty plea.  Defendant said that he discussed the accusations with attorney Horowitz, and that Horowitz did not say anything, so Defendant fired him.

### 3.  The Plea Colloquy

On January 11, 2010, Defendant appeared before Judge Moore for the first time. He testified at the evidentiary hearing that he thought he was going to trial at that time. Defendant had not signed the plea agreement before going to court.  Attorney Horowitz had neither reviewed a plea colloquy with Defendant before going to court nor shown Defendant any motions he intended to file.

Defendant testified at the evidentiary hearing that in the plea agreement, there were two counts, one for powder cocaine and cocaine base, and one for a gun.  While Defendant claimed that attorney Horowitz had not shown him anything before the January 11, 2010 appearance, Defendant admitted that he had seen the plea agreement once at a debriefing.  Defendant contended that he found out about a change of the case number at the last minute.[3]

Defendant asserted that attorney Horowitz tricked him into signing the plea agreement, claiming that in court on January 11, 2010, Horowitz told him that if he signed the plea agreement, there would be no trial, he would be sentenced as a Level 26

---

[3] One of Defendant's *pro se* claims is that the Case Number was improperly changed from the number assigned at his initial appearance on the Complaint to the number assigned to the Indictment.

and the government would not file the 851 enhancement.  Defendant claimed that at that time, he had not seen a written version of the plea agreement.  Defendant testified inconsistently at the evidentiary hearing that when he signed the plea agreement, the handwriting and whiteout on page two of the plea agreement were not there; and, also that he signed the plea agreement after the handwritten changes had been made. Defendant asserted that he did not read the changed provisions in the plea agreement, and that Horowitz did not read or explain the changes to him.

Defendant testified that after he signed the plea agreement, attorney Horowitz talked to the prosecutor, came back and said that the government was going to apply the Section 851 enhancement to Defendant.  Defendant testified that Horowitz still promised him a Level 26 sentence.

During the plea colloquy, Defendant, even though he had not read everything, told Judge Moore that he was satisfied with his representation and that he had had an opportunity to read and discuss the plea agreement before he signed it.  At the hearing, Defendant testified that he had made this statement at the plea colloquy because attorney Horowitz had promised him a Level 26 sentence.  Defendant further claimed that during the plea colloquy, Horowitz would signal Defendant with his head when he wanted Defendant to say yes or no to Judge Moore.  Defendant testified that during the plea colloquy he told Horowitz that he did not understand what was going on, and Horowitz told Defendant everything was ok and that it was all going to be all right. Defendant also testified that he continued to tell Horowitz during the plea colloquy that he did not understand and that he did not know what was going on, but that Horowitz kept pushing the plea on Defendant.  Defendant asserted that he pled guilty out of fear. Defendant also asserted at the hearing that he had told Horowitz that he had a mental

defect, and that sometimes he had to say things immediately before he forgot them.

At the hearing, Defendant testified that when Judge Moore asked him during the plea colloquy if the plea agreement represented the entire agreement that he had with the government, Defendant answered according to the understanding he believed he had with attorney Horowitz - - that if he signed the plea agreement, the government would not file the 851 enhancement. Defendant also testified that during the plea colloquy he had said he did not want to plead guilty with the enhancement.

Defendant also testified that he pled guilty because he did not think he was ready for trial because attorney Horowitz had not discussed trial strategy with him. Defendant said that whenever he conferred with Horowitz during the plea colloquy, Horowitz promised him a Level 26 without the enhancement, and said he would try to have the enhancement removed at sentencing. Defendant also testified that when the government made its factual proffer during the plea colloquy, and he said it was correct, he did not understand it, but just said yes because Horowitz told him to.

At the hearing, Defendant was not sure if he had received a copy of the plea agreement in the mail before the plea colloquy or after. Also at the hearing, Defendant first stated that he did not say he was guilty at the plea colloquy, but then admitted that he had said he was guilty.

Defendant said that he had discussed the plea agreement with his friends in FDC, and that he had sought help from these friends because the lawyers were not doing anything for him.

### B.  AFPD Farina's Testimony

AFPD Vincent Farina testified that he had been an Assistant Federal Public Defender for seventeen years, that he had been in private practice before that, and that

he had been a police officer before that.  He estimated that he handled 45 to 60 cases a year.

AFPD Farina testified that he had received Defendant's file from AFPD Daryl Wilcox in Broward County, who believed Defendant was a career offender.  Farina met Defendant at FDC, introduced himself, and asked Defendant about possible witnesses. Farina told Defendant that a preliminary evaluation indicated that Defendant was a career offender, and that he could also be subject to a Section 851 enhancement, which could double the guideline range and could have an effect on the statutory penalties.  Farina realized that it would take some time to build trust with Defendant, and he told Defendant that he'd come back to see him in a few days.

Between AFPD Farina's first and second meetings with Defendant, Farina's investigator spoke to witnesses and tried to find the address of the person who may have asked Defendant to accept the package containing the cocaine which is the subject of these charges.  Farina also received discovery from the government.  Farina thought there was a defense in this case since Defendant's name was not on the package and since the undercover government agent asked Defendant to accept the package.

AFPD Farina had his second meeting with Defendant within a week of the first meeting.  Farina had received an NCIC printout showing Defendant's criminal history. Farina showed Defendant Sentencing Guidelines Section 4B1.1, the career offender guideline, and pointed out where he would fall on the guidelines, estimating Defendant's sentencing range as 188 to 235 months with a Criminal History of 6, and an offense level 34, which, assuming 3 points off for acceptance of responsibility, would be reduced to an offense level 31.  On November 17, 2009, because the corrections officers would not let inmates take documents from a meeting to their cells, Farina sent the materials to

Defendant.  *See* Exhibit 1.  At the meeting, Defendant argued that he was not a career offender and was not an armed career criminal, and that his sentencing range was 57 to 71 months.  Farina said that based on Defendant's drug convictions, he thought Defendant was a career criminal.  Farina told Defendant that they were getting ready for trial, and Defendant had a defense if Farina could get confirmation from other witnesses. Farina also said he was thinking of filing a suppression motion, based on the government entering Defendant's home without permission and before they received written permission from Defendant's girlfriend.  Defendant said he did not want to go to trial, and Farina said Defendant had to go to trial if he was innocent because an innocent person could not plead guilty.  Farina also discussed cooperation with Defendant, because the government wanted to talk to him.  Farina encouraged Defendant to let his investigation regarding the defense continue before Defendant made any decisions. Farina never actually discussed a proposed plea agreement with Defendant because the government never provided Farina with a proposed plea agreement.  However, Farina's first focus was getting ready for trial.  Farina also advised Defendant not to listen to any of the other FDC inmates on legal matters.

        At AFPD Farina's third meeting with Defendant, in late November, 2009, Farina was accompanied by his investigator, Randy Weinstein, who was a former policeman and former FBI agent.  Weinstein told Defendant he had done an area canvass and had spoken with potential witnesses including Defendant's landlord and Defendant's girlfriend.  Farina told Defendant that after hearing what Defendant's girlfriend had to say, he did not think he should file a suppression motion.  Defendant again argued with Farina about the career offender status and the expected guideline range.  Farina again informed Defendant about the possibility of a Section 851 enhancement, but Defendant

did not accept that the government could file a Section 851 enhancement against him. Farina told Defendant that he could not plead guilty based upon the evidence they had. Defendant was told that Weinstein was continuing to investigate, and was going to try to find Selwyn Gonzalez, the addressee on the package, and that Weinstein had a lead on Gonzalez's whereabouts.  Defendant then gave Farina a location for Dread, whose first name was Andre.  Defendant told Farina that Dread was the person who had asked him to accept the package.

At AFPD Farina's fourth meeting with Defendant, on or about December 10, 2009, Defendant told Farina that he wanted another lawyer, because he was not satisfied with Farina's interpretation of the career offender issue and because he thought Farina was not doing enough for him.  Defendant asked Farina to move to withdraw.  Farina said he would move to withdraw if Defendant wanted, plead Defendant guilty, or go to trial on January 4, 2010.

On December 16, 2009, after the meeting, AFPD Farina sent Defendant a letter which explained that Defendant was a career offender, gave Defendant a guideline calculation, and told Defendant that Defendant's guideline calculation was too low. Farina also enclosed the copies of the two convictions which would be used to show Defendant's career offender status.  Farina further noted that he had seen Defendant showing some papers to another inmate, and that he was worried the other inmate could be an informant, so Farina advised Defendant not to speak with anyone except Weinstein or himself, and told Defendant not to be surprised if he saw an inmate turn up at Defendant's trial as a government witness.  *See* Exhibit 2.

On December 21, 2009, AFPD Farina filed a motion to withdraw (DE # 17).  At the end of the December 23, 2009 hearing on the motion to withdraw, Farina asked

14

government counsel not to file the Section 851 enhancement until Defendant had new counsel so that Defendant could get advice and make an informed decision.  The government agreed to do so.

After AFPD Farina withdrew from the case, he discussed the case with attorney Horowitz, Defendant's new attorney, told Horowitz that the case file was at the FPD's office and that Farina would be away until January 4, 2010.  Farina told Horowitz about what the investigator had found out and about Defendant's problem accepting that he was a career offender.

### C.  Attorney Horowitz's Testimony

Phillip Horowitz, Esq. has practiced for 25 years as a criminal defense attorney, and has participated in approximately 100 trials.

Attorney Horowitz was appointed to represent Defendant Clayton on the evening of December 23, 2009.  The next morning, Horowitz went on CM/ECF to print out as many pleadings as possible.  He also left AFPD Farina a voicemail because both Farina's telephone message and Farina's secretary's telephone message said that they would return to work on January 4, 2010.  Horowitz also told the prosecutor that he would be filing a motion to continue the trial for one trial period because he would not be able to get the file from Farina until January 4, 2010.  The prosecutor told Horowitz that he did not oppose the motion to continue the trial.  Horowitz also wrote a letter to Defendant advising him of his appointment and also enclosed a copy of the motion to continue. Horowitz noticed that the calendar call was on December 30, 2009.  Horowitz was going to be out of town on that date, so he arranged for a colleague to cover the calendar call. At the calendar call, Judge Moore continued the trial until January 11, 2010 (DE # 21).

Attorney Horowitz returned to Miami on the evening of December 30, 2009.  On

Thursday, December 31, 2009, he saw Defendant at FDC for about an hour and a half.  It was only an introductory meeting because all Horowitz knew about the case was what was in the court file, *i.e.*, the Indictment, the Criminal Complaint, and the government's discovery notices.  Defendant explained to Horowitz the problems he had with Farina.  Specifically, Defendant complained that Farina hadn't spent enough time with him and hadn't explained the guidelines to Defendant's satisfaction.  Defendant was also upset that he would be considered a career offender.  Defendant showed Horowitz Farina's December 16, 2009 letter, and Horowitz discussed it with Defendant.  Horowitz also discussed the guidelines with Defendant.  Defendant thought he would be treated as an armed career criminal.  Horowitz told Defendant that this would not happen, as his case did not involve a firearm.  Horowitz also told Defendant that he appeared to be a career offender, but since Horowitz had not examined the case file, he would reserve judgment.  Horowitz then told Defendant that if he pled guilty, he was looking at a sentence of 188 to 235 months, and more if he went to trial.  They talked about going to trial.  Defendant said he wanted the matter resolved and asked Horowitz to give him the best offer he could get.  Defendant gave Horowitz no reason for not wanting to go to trial.

After the meeting, attorney Horowitz thought Defendant might have a mens rea defense.  Horowitz also did research on Defendant's convictions.

On Monday, January 4, 2010 at 9:00 a.m., attorney Horowitz next saw Defendant at FDC.  At that time, Defendant had not received the mail Horowitz had sent on December 24 or the mail Horowitz had sent on December 31.  Defendant again told Horowitz to that he wanted to plead guilty in return for a sentence of from 3 to 5 years.  Horowitz explained to Defendant that although in the state system, the prosecutor and defense agreed on an actual sentence, that was not how the federal system worked.  Horowitz

16

told Defendant that, for example, he was indicted on only one count, so he couldn't charge bargain.  Horowitz further informed Defendant the while in the federal system counsel, individually or jointly, could make sentencing recommendations to the judge, the actual sentence was totally up to the judge.  Defendant raised the career offender issue again.  Horowitz again explained to Defendant the difference between the armed career criminal and the career offender designations, and also discussed with Defendant Section 4B1.1 of the Sentencing Guidelines.  Horowitz told Defendant that he needed to see the file before going any further.

After leaving the January 4 meeting with Defendant, attorney Horowitz received a voicemail from Farina saying that Horowitz could pick up the file.  Horowitz then went to the FPD's office and copied the relevant portions of Farina's file, focusing on Farina's investigation and on the discovery which Farina had received from the government.

Also on January 4, attorney Horowitz contacted the prosecutor about a plea offer. Horowitz asked the prosecutor for multiple forms of the plea agreement because he was not sure if Defendant would cooperate.  Horowitz told the prosecutor that if Defendant would cooperate, and received a benefit from the government, Horowitz would recommend that Defendant waive his right to appeal.  If Defendant would not cooperate, however, Horowitz would not recommend that Defendant waive his right to appeal.  The government wanted to speak to Defendant, so a meeting and discovery conference was set for January 6, 2010 at  10:00 a.m.  On January 4, the government emailed Horowitz both versions of the plea agreement, together with a substantial assistance side agreement, if Defendant wanted to cooperate, and a limited use immunity letter for the meeting.

On January 5, 2010, attorney Horowitz did not see Defendant as he was reviewing

the FPD's file.  Horowitz thought the FPD's investigation was excellent.  They had taken a statement from Defendant's girlfriend, Twila Johnson, and had tracked down Dread and his address.  The file had copies of all of Defendant's prior convictions.  The only action Horowitz would need to prepare for trial was to subpoena the witnesses.

Present at the Wednesday, January 6, 2010 meeting were three agents, all the evidence, Defendant and attorney Horowitz.

Attorney Horowitz first met alone with Defendant and showed him copies of both plea agreements.  Horowitz reviewed the agreement with Defendant, explaining to Defendant the differences between them.  Defendant and Horowitz went over each paragraph of the plea agreements, including the maximum penalties and the waiver of Defendant's right to appeal.  They also reviewed the side cooperation agreement and the immunity letter.  They discussed the 851 enhancement, and Horowitz told Defendant that if he accepted either plea agreement, the government would not file the 851 enhancement.  Horowitz also told Defendant that the if the government were to file the 851 enhancement, it would raise his minimum sentence from 5 years to 10 years and his maximum sentence from 40 years to life.  Horowitz also told Defendant that if he was convicted after trial as a career offender, the guidelines indicated a sentence of 30 years to life, but that the actual sentence would be up to Judge Moore; but, if Defendant went to trial and was acquitted, he could go home.  Horowitz explained to Defendant he could also could plead guilty without cooperating, and face a guideline range of 188 to 235 months, or he could plead guilty and cooperate with the government, with an opportunity for a lesser sentence.  Horowitz told Defendant that it was solely Defendant's decision as to what to do.

Defendant rejected the plea agreements and told Horowitz that he wanted to go to

trial.  Attorney Horowitz said they were not in a good place to start planning the defense and to review discovery, so he would see Defendant at FDC on the next day, Thursday, January 7.

Attorney Horowitz reviewed the evidence after speaking to Defendant.  Horowitz examined the cocaine, the box the drugs had come  the Virgin Islands newspapers that had been in the box, the address label that had been on the box, small baggies, some with marijuana residue, and a baggie of marijuana.  This was the only evidence that Horowitz had not previously seen in AFPD's Farina's file.

Later that day, Horowitz received the postal inspector's grand jury testimony and sent a copy to Defendant.  Horowitz spent the rest of January 6 preparing for the trial.

On January 7, 2010, attorney Horowitz saw Defendant at FDC for about an hour.  Horowitz wanted to speak to Defendant's girlfriend, Twila Johnson.  Horowitz thought she might be helpful to Defendant's case.  Defendant and Horowitz discussed the possible defenses and the case.  They did not discuss a plea agreement, because Defendant had rejected the plea offers.  Horowitz told Defendant he wouldn't see him on January 8, because Horowitz needed to prepare for trial.

On the night of Thursday, January 7, 2010, Twila Johnson, Defendant's girlfriend, called attorney Horowitz.  She said that Defendant had changed his mind, wanted to plead guilty, and wanted to see Horowitz the next day.  On January 8, Horowitz called the prosecutor and asked him not to file the 851 enhancement yet because Defendant wanted to plead guilty.  The prosecutor agreed not to file the enhancement.  Horowitz also notified Judge Moore's chambers that Defendant might plead guilty.

On Friday, January 8, 2010, attorney Horowitz and went to FDC to see Defendant.  Defendant told Horowitz that he knew if he told Twila Johnson to tell Horowitz that he

19

was going to plead guilty, Horowitz would come running.  Defendant was agitated, saying that he did not want to plead, that his lawyers had not treated him well, and that on Monday morning, he was going to ask Judge Moore to relieve Horowitz.   Defendant said that his sole purpose in having Johnson make the call was to drag Horowitz to FDC to complain that he couldn't get the 3 to 5 year deal he wanted, that he was not a career offender, and he wanted to go to trial.  Horowitz told Defendant that whatever he wanted was fine and the decision was his.  Horowitz the left FDC thinking the case would go to trial on Monday.  Including the January 8 meeting, Horowitz had met with Defendant 5 times for a total of about 7 hours.

After leaving FDC, attorney Horowitz told Judge Moore's chambers that Defendant was not going to plead guilty, and told the same thing to the government.  On January 8, 2010, Horowitz filed proposed jury instructions and a motion to exclude Fed.R.Evid. 404(b) evidence (Defendant's prior drug convictions).  On Saturday, January 9, 2010, the government filed the section 851 enhancement.  On January 10, 2010, Horowitz filed a motion in limine to exclude the baggies and the personal use marijuana found in Defendant's house.

On Saturday night, January 9, 2010, attorney Horowitz received a message from Twila Johnson.  Horowitz called Johnson back on Sunday, January 10, 2010.  Johnson said Defendant had called her again, told her he wanted to plead guilty and had asked her to apologize to Horowitz for the way he had acted on Friday.  Horowitz told Johnson to inform Defendant that the 851 enhancement had been filed, that Horowitz would see him in court on Monday morning, and Defendant should decide what he wanted to do.

On Monday, January 9, 2010, attorney Horowitz arrived at court at 9:00 a.m.  He was  prepared for trial.  He had prepared an opening statement and a defense.  As

Horowitz understood the case, Defendant was to receive a small amount of money, $100 or less, from Dread to accept the package, and Dread would then take the package. Horowitz was ready to cross-examine the government witnesses. His subpoenaed witnesses, Twila Johnson and Dread, the ultimate recipient of the package, were both present in court.  Horowitz also mentally prepared a closing argument in general terms, which he would revise depending on the evidence at rial..

When Defendant was brought into court, he told Horowitz that he wanted to plead guilty.  Attorney Horowitz asked Defendant which plea agreement he wanted.  Defendant said he wanted to cooperate, and that he was willing to take the plea agreement which included the waiver of his right to appeal.  Horowitz told Defendant he was now subject to the 851 enhancement, which the government had filed the previous Saturday, and which would raise Defendant's minimum sentence from 5 years to 10 years and his maximum sentence from 40 years to life.  Horowitz made no guarantee to Defendant that the government would withdraw the 851 enhancement, but he said that he would ask the government to withdraw it.

Attorney Horowitz then spoke to the prosecutors regarding Defendant's decision to plead guilty.  The prosecutors did not have a plea agreement with them, so Horowitz gave them had a copy of the relevant plea agreement from his file.  The government attorneys made the handwritten corrections and cross-outs, which reflected the change in the penalties due to the 851 enhancement.  Horowitz then took about an hour to again go over every provision of the plea agreement with Defendant.  Horowitz told Defendant that the handwritten corrections and cross-outs were the changes due to government's filing of the 851 enhancement.  Then the government attorney, Horowitz and Defendant

each signed the agreement and initialed the changes.[4]

Attorney Horowitz testified at the evidentiary hearing that he spent more time going over the agreement with Defendant than Judge Moore took to conduct the plea colloquy.  Defendant seemed to understand the plea agreement, which was the same plea agreement they had reviewed on January 6, but now with the enhancement added. Horowitz testified at the evidentiary hearing that he never guaranteed Defendant that his offense level would be level 26, but told him that the applicable offense level would be 34.  Horowitz also told Defendant he would argue for a downward guideline variance at sentencing, because Defendant's criminal history was overstated, but that the actual sentence would be up to Judge Moore.  Horowitz also told Defendant that he would encourage the government to withdraw the 851 enhancement.

Immediately before the plea colloquy, attorney Horowitz had a chance to review over with Defendant some of the questions which Horowitz thought Judge Moore would ask during the plea colloquy so Defendant would be more comfortable during the colloquy.   Horowitz did not tell Defendant to answer yes to the question as to whether he was fully satisfied with his counsel and representation. but he had told Defendant that would be one of the questions asked.  Horowitz also told Defendant to answer out loud during the plea colloquy so that the court reporter could take everything down. Horowitz testified at the evidentiary hearing that he did not coach Defendant during the plea colloquy.

At the evidentiary hearing, attorney Horowitz testified that during the plea colloquy, whenever he spoke to Defendant, he asked Defendant if he still wanted to

---

[4] Horowitz testified that Defendant signed the agreement after the corrections and cross-outs had been made.

plead guilty and reminded Defendant that it was his decision whether to go through with the plea, and that Defendant could still go to trial.  During the plea colloquy, Defendant was still upset with that the government had filed the 851 enhancement.  Horowitz then asked Judge Moore to advise Defendant, on the record, of the maximum penalties connected with the enhancement because the government had not withdrawn the enhancement.  After that, Defendant seemed to understand that the enhancement was applicable to him.

Also during the colloquy, attorney Horowitz again told Defendant that under the plea agreement, there would be a 10 year minimum sentence, and while Horowitz would do his best to have the government withdraw the 851 enhancement, he could not promise that it would happen.

Attorney Horowitz testified at the evidentiary hearing that during the colloquy, he did not tell Defendant how to answer the question about whether he was pleading guilty of his own free will, and that he gave Defendant no guidance.  Horowitz also did not tell Defendant how to answer the question about whether he and Defendant had discussed the sentencing guidelines and how they might apply to Defendant in this case.  Horowitz also did not promise Defendant an offense level of 26.

Attorney Horowitz further testified at the evidentiary hearing that later in the colloquy, he explained to Defendant  what parole was.  He also talked to Defendant about whether Defendant agreed with the government's factual proffer.  Horowitz did not tell Defendant how to answer the question, did not promise him an offense level of 26 and did not tell Defendant that he had to answer yes to the question about whether he agreed with the government's factual proffer.

Finally, attorney Horowitz testified at the evidentiary hearing that when Judge

23

Moore asked Defendant how he pleaded, Horowitz asked Defendant whether he wanted to plead guilty or not, but that he did not tell Defendant what to do.  Horowitz stated that he thought that Defendant understood he could plead guilty or go to trial; and Defendant chose to finish the plea.

Subsequently, Defendant agreed to be debriefed by the government.  Attorney Horowitz testified at the evidentiary hearing that he agreed with Defendant's choice.  On Thursday, January 14, 2010, Defendant was debriefed.  Present were Defendant, Horowitz, the prosecutor, and two postal inspectors.  During the debriefing, Defendant said that on multiple occasions, Dread paid him money to receive packages.  Defendant also said Dread had paid him between $80 and $100 per package, and had given Defendant some marijuana on occasion.  Defendant said that he never knew what was in the packages, but assumed it was drugs.  Defendant said that he had also purchased marijuana from Dread on prior occasions, both for personal use and for sale.

### IV. <u>FINDINGS OF FACT</u>

Initially, the undersigned credits the testimony of AFPD Farina and attorney Horowitz at the evidentiary hearing.  The attorneys appeared to testify truthfully, they had no reason to testify untruthfully, their testimony was consistent and made sense. The undersigned does not credit Defendant's testimony at the evidentiary hearing where it diverged from the testimony of AFPD Farina and attorney Horowitz.  This finding is based on Defendant's demeanor at the evidentiary hearing, the undersigned's observation of Defendant during prior appearances, and Defendant's self-interested testimony.  This finding is also based on the fact that the undersigned and Defendant's attorneys had all explained to Defendant, on numerous occasions, the difference for sentencing guideline purposes between an armed career criminal, which Defendant was

24

not, and a career offender, which Defendant was.  It does not seem possible that Defendant did not understand the difference after it had been explained to him so many times, unless Defendant deliberately refused to accept the law in this regard.  The undersigned also notes that Defendant's behavior toward attorney Horowitz bordered on the capricious, especially on Friday, January 8, 2010, when he interrupted Horowitz's trial preparation to get Horowitz to travel to FDC under false pretenses so that he could rail at Horowitz for imaginary defects in representation.  Moreover, Defendant's testimony at the evidentiary hearing before the undersigned Magistrate Judge was flatly contradicted by his statements under oath during the plea colloquy.

Therefore, based upon an examination of the plea agreement, the transcript of the plea colloquy, the letters sent to Defendant by AFPD Farina, the transcript of the December 23, 2009 hearing on AFPD Farina's motion to withdraw, the testimony of AFPD Farina and attorney Horowitz at the evidentiary hearing, and the lack of credibility present in Defendant's testimony at the evidentiary hearing, the undersigned finds that Defendant's guilty plea was knowingly and voluntarily made, with the full, close and effective assistance of counsel.  Defendant understood the questions that were asked by the District Judge during the plea colloquy and his answers at that time, including the fact that he was pleading guilty because he was guilty, were truthful.  The following findings of fact are based upon the above credibility determination, and the evidence developed at the hearing.

1.  Defendant is 38 years old.  He went to school through the eighth grade. He believes that he was tested about fifteen years ago and was found to read at a third grade level.  Defendant's testimony was articulate and he displayed a good understanding of the criminal justice system.

2.  After Defendant was arrested, Assistant Public Defender Vincent Farina was assigned to represent him.

3.  After undertaking Defendant's representation, AFPD Farina met with Defendant at FDC, introduced himself, and asked Defendant if there were any witnesses to the offense.  Farina also told Defendant that a preliminary evaluation indicated that Defendant might be a career offender for sentencing guideline purposes, and that Defendant could also be subject to a Section 851 enhancement, which could double the guideline range and could have an effect on the statutory penalties.  Farina told Defendant he would see him again in a few days.

4.  Between AFPD Farina's first and second meetings with Defendant, Farina's office began investigating the crime, and Farina also received discovery materials from the government.  Farina's investigator spoke to witnesses in an effort to find the address of the person who asked Defendant to accept the package. Farina thought Defendant might have a mens rea defense, as Defendant's name was not on the package and Defendant was asked to accept the package by a third party, and had been asked by the undercover government agent to sign for the package.

5.  Within a week of the first meeting, AFPD Farina had his second meeting with Defendant.  At the meeting, Farina showed Defendant the career offender sentencing guideline, and pointed out the expected applicable guideline range.  Farina estimated Defendant's sentencing range as 188 to 235 months, based upon a Criminal History of 6, and an offense level of 34, which could be reduced to level 31 if Defendant pleaded guilty and received a 3 level reduction based on acceptance of responsibility.  After the meeting, Farina sent copies of the materials to Defendant.  *See* Exhibit 1.  Defendant argued with Farina that he was not a career offender and was not an armed career

criminal, and that his sentencing range was 57 to 71 months.  Farina responded that he thought Defendant was a career criminal.  Farina told Defendant that they were preparing for trial, and Defendant had a defense.  Farina also said he was thinking of filing a suppression motion, based on the entry by government agents into Defendant's home, without permission and before they received written permission from Defendant's girlfriend.  Defendant said he did not want to go to trial.  Farina told Defendant that if he maintained his innocence, he had to go to trial.  Farina also discussed cooperation with Defendant, because the government wanted to talk to him.  Farina encouraged Defendant to let the investigation continue and see if there was a defense before he made any decisions about pleading guilty or cooperating.  Finally, Farina also advised Defendant not to listen to any of the inmates at FDC concerning legal matters.

6.   At his third meeting with Defendant, in late November, 2009, AFPD Farina also brought his investigator to see Defendant.  The investigator had spoken with potential witnesses including Defendant's landlord and Defendant's girlfriend, Twila Johnson.  Farina told Defendant that after talking to Johnson, he did not think he should file a suppression motion.  Defendant again argued with Farina about the career offender status and the expected guideline range.  Farina again informed Defendant about the possibility of a Section 851 enhancement, but Defendant did not accept that it was a possibility.  Farina told Defendant that he should not plead guilty, based upon the evidence they had.

7.   At the fourth meeting with Defendant, on or about December 10, 2009, Defendant told AFPD Farina that he wanted another lawyer, because he was not satisfied with Farina's interpretation of the career offender issue and because he thought Farina was not doing enough for him.  He asked Farina to move to withdraw.  Farina said he

would move to withdraw if Defendant wanted, plead Defendant guilty, or go to trial on January 4, 2010.

8.  After the meeting, on December 16, 2009, Farina sent Defendant a letter which explained that Defendant was a career offender, gave Defendant a guideline calculation, and told Defendant that Defendant's guideline calculation was too low.  Farina also enclosed copies of two of Defendant's convictions which could be used to show that Defendant was a career offender status.  In the letter, Farina also noted that he had seen Defendant showing some papers to another inmate, and that he was worried the other inmate could be an informant.  Farina advised Defendant not to talk about the case with anyone except Farina or the investigator, and told Defendant not to be surprised if he saw an inmate turn up as a government witness at trial.  *See* Exhibit 2.

9.  On December 21, 2009, AFPD Farina filed a motion to withdraw.  During the December 23, 2009 hearing on the motion to withdraw, the undersigned Magistrate Judge explained to Defendant the difference between a career offender and an armed career criminal.  Exhibit 3 at 9-11.  Farina was allowed to withdraw, and new counsel was appointed for Defendant.  At the end of the hearing, AFPD Farina asked government counsel not to file the Section 851 enhancement until Defendant had new counsel so Defendant could get advice about cooperating and make an informed decision, and the government agreed.  Exhibit 3 at 12.

10.  On the evening of December 23, 2009, attorney Philip Horowitz was appointed to appear for Defendant.  On the morning of December 24, 2009, he attempted to prepare as much as he could.  He tried to get the file from AFPD Farina, but had to leave him a voicemail because Farina's message and Farina's secretary's message said that they were out of the office and would return on January 4, 2010.  Horowitz also told the

prosecutor that he would be filing a motion to continue the trial for one trial period because he would not be able to obtain the file from Farina until January 4, 2010.  The prosecutor said he would not oppose the motion.  Horowitz also wrote a letter to Defendant advising him of his appointment and enclosed a copy of the motion to continue.  Horowitz also noted that the calendar call was on December 30, 2009, when Horowitz would be out of town, so he had a colleague cover the calendar call, at which Judge Moore continued the trial until January 11, 2010.

  11. Attorney Horowitz returned to Miami on the evening of December 30, 2009. On December 31, 2009, he met with Defendant at FDC for about an hour and a half.  It was only an introductory meeting.  Horowitz only knew about the case from what was in the court file.  Defendant complained to Horowitz that AFPD Farina hadn't spent enough time with him, and hadn't explained the guidelines to Defendant's satisfaction. Defendant showed Horowitz Farina's December 16 letter, and was upset that he would be considered a career offender.  Defendant told Horowitz he thought he would be treated incorrectly as an armed career criminal.  Horowitz told Defendant that this would not happen, as his case did not involve a firearm, but that Defendant appeared to be a career offender.  Horowitz opined that if Defendant pleaded guilty, he would face a sentence of 188 to 235 months, and more if he went to trial.  Defendant said he wanted the matter resolved and asked Horowitz to obtain the best offer he could.  Defendant gave Horowitz no reason for not wanting to go to trial.

  12. After the meeting with Defendant, attorney Horowitz considered using a mens rea defense at trial.  He also began to research Defendant's convictions.

  13. On Monday, January 4, 2010 at 9:00 a.m., attorney Horowitz again met with Defendant at FDC.   Defendant wanted Horowitz to get him a deal for 3 to 5 years.

Horowitz explained to Defendant that in this case, Defendant had little leverage.  While counsel, individually or jointly, could make sentencing recommendations to the judge, the actual sentence would be totally up to the judge.  Horowitz again had to explain to Defendant the difference between the armed career criminal and the career offender designations.  Horowitz said he needed to see the FPD's file before discussing the case further.

14.  Later that day, AFPD Farina told attorney Horowitz that the file was at the FPD's office, discussed what his investigator had discovered, and discussed Defendant's problem with being designated a career offender.  Horowitz went to the FPD's office and copied the relevant portions of Farina's file, especially the investigation results and the discovery materials.

15.  Also on January 4, attorney Horowitz contacted the government about a plea offer.  Horowitz asked for multiple forms of the plea agreement because he was not sure if Defendant would cooperate.  The government wanted to speak to Defendant, so a meeting was set for January 6, 2010 at 10:00 a.m.  Later on January 4, the government emailed Horowitz both versions of the plea agreement, together with a substantial assistance side agreement, and a limited use immunity letter for the January 6, 2010 meeting.

16.  On January 5, 2010, attorney Horowitz spent all day reviewing the FPD's file and did not see Defendant that day.  Horowitz thought the FPD's investigation was excellent.  They had taken a statement from Defendant's girlfriend, Twila Johnson, and had also tracked down Dread and his address.  The file contained copies of all of Defendant's prior convictions.  The only thing Horowitz needed to do for trial was to subpoena the witnesses.

17.   At the January 6, 2010 meeting were three agents, Defendant and attorney Horowitz.  Horowitz had copies of both plea agreements for Defendant, and reviewed them with Defendant, explaining to Defendant the differences between them.  Defendant and Horowitz went over each paragraph of the plea agreements, including the maximum penalties and the appellate waiver.  They also went over the side agreement and the immunity letter.  They discussed the 851 enhancement, and Horowitz told Defendant that if he accepted either plea agreement, the government would not file the 851 enhancement.  Horowitz also told Defendant that the 851 enhancement would raise his minimum sentence from 5 to 10 years and his maximum sentence from 40 years to life. Horowitz told Defendant that if he was convicted after trial as a career offender, the guidelines indicated a sentence of 30 years to life, but the actual sentence was up to Judge Moore.  Therefore, he advised that Defendant could plead guilty without cooperating and face a guideline range of 188 to 235 months, or he could plead guilty and cooperate, with an opportunity for a lesser sentence.  However, if Defendant went to trial and was acquitted, he could go home.  Horowitz told Defendant that it was his decision as to what to do. Defendant rejected the plea agreements and told Horowitz he wanted to go to trial.  Horowitz said he would see Defendant at FDC on Thursday, January 7.  Horowitz then reviewed the tangible physical evidence that the government agents had brought for his review.  Later that day, Horowitz received additional written discovery from the government, and sent a copy to Defendant.  Horowitz spent some of the rest of the day preparing for the trial.

18.   On January 7, 2010, attorney Horowitz met with Defendant at FDC for about an hour.  Horowitz wanted to speak to Defendant's girlfriend, Twila Johnson, who Horowitz thought might be helpful.  Horowitz and Defendant discussed his defense, but

31

did not discuss a guilty plea.  Horowitz told Defendant he would not see him the next day because Horowitz would be preparing for trial.

19.  That night, attorney Horowitz got a call from Twila Johnson, who said Defendant had changed his mind, wanted to plead guilty and wanted to see Horowitz the next day.  On January 8, 2010, Horowitz called the prosecutor and asked him not to file the 851 enhancement yet because Defendant wanted to plead guilty.  The prosecutor agreed.  Horowitz also notified Judge Moore's chambers that Defendant might plead guilty.

20.  Attorney Horowitz then dropped everything and went to meet with Defendant at FDC.  Defendant told Horowitz that he knew that if he told Johnson to tell Horowitz that he was going to plead guilty, Horowitz would come running.  Defendant was agitated, and said that he did not want to plead guilty, that his lawyers had not treated him well, and that on Monday morning, he was going to ask Judge Moore to relieve Horowitz.  Defendant said his sole purpose was to drag Horowitz to FDC to complain that he couldn't get the 3 to 5 year deal he wanted, that he was not a career offender, and he wanted to go to trial.  Horowitz told Defendant that whatever he wanted was fine and the decision was his.  Horowitz left FDC thinking the case would go to trial on Monday. After this meeting, Horowitz had met with Defendant 5 times for a total of about 7 hours.

21.  After leaving FDC, attorney Horowitz called Judge Moore's chambers and the prosecutor and said that Defendant was not going to plead guilty.  On Saturday, January 9, the government filed the section 851 enhancement.  Horowitz then filed pretrial motions and proposed jury instructions.

22.  On Saturday night, January 9, attorney Horowitz received a telephone message from Twila Johnson.  Horowitz called Johnson on Sunday, January 10.

Johnson said Defendant had called her again, said he wanted to plead guilty and had apologized for the way he acted.  Horowitz told Johnson to inform Defendant that the 851 enhancement had been filed, Horowitz would see Defendant on Monday morning in court, and that Defendant should decide what he wanted to do.

23.  On Monday, January 11, attorney Horowitz arrived at court at 9:00 a.m.  He was prepared for trial.  As Horowitz understood the case, Defendant was to receive a small amount of money, $100 or less, from Dread to accept the package, and Dread would then take the package.  Horowitz was ready to cross-examine the government witnesses.  His subpoenaed witnesses, Twila Johnson and Dread, the ultimate recipient of the package, were both present.  He had prepared an opening statement.  Horowitz also had mentally prepared a general closing argument, which he would tailor in accordance with the evidence at trial.

24.  When Defendant was brought into the courtroom, he told attorney Horowitz that he wanted to plead guilty.  Horowitz asked Defendant which plea agreement he wanted and Defendant said he wanted to cooperate, and was willing to take the plea agreement which included the waiver of his right to appeal.  Horowitz warned Defendant he was now subject to the 851 enhancement, which would raise Defendant's minimum sentence from 5 years to 10 years, and his maximum sentence from 40 years to life.  Horowitz also made no guarantee to Defendant that the government would withdraw the 851 enhancement, but said that he would ask the government to withdraw it.

25.  Attorney Horowitz then spoke to the prosecutors, who did not have a plea agreement with them.  Horowitz had a copy of the relevant plea agreement in his file.  The government attorney made the handwritten corrections and cross-outs.  Horowitz then spent about an hour to go over every provision of the plea agreement with

33

Defendant again.  Horowitz told Defendant that the handwritten corrections and cross-outs were the changes due to government's filing of the 851 enhancement.  Then, the government attorney, Horowitz and Defendant each signed the agreement and initialed the changes.  Horowitz spent more time reviewing the agreement with Defendant than Judge Moore took to conduct the plea colloquy.

26.  Defendant seemed to understand the plea agreement, which was the same plea agreement they had gone over on January 6, but now with the enhancement added. Attorney Horowitz never guaranteed Defendant he would get an offense level of 26, but told him that the applicable offense level would be 34.  Horowitz told him he would argue for a downward guideline variance at sentencing, because Defendant's criminal history was overstated, but that Defendant's actual sentence would be up to Judge Moore.

27.  Immediately before the plea colloquy, attorney Horowitz had a chance to go over with Defendant some of the questions which Judge Moore would ask during the plea colloquy so Defendant would be more comfortable during the colloquy.  Horowitz did not tell Defendant to answer yes to any questions.  Horowitz did not coach Defendant during the plea colloquy.  During the plea colloquy, the Court provided Defendant the opportunity to speak privately to counsel on several occasions.  Whenever Defendant spoke to attorney Horowitz, Horowitz asked Defendant if he still wanted to plead guilty and reminded Defendant that it was his decision whether to go through with the plea and that Defendant could still go to trial.

28.  When the Court asked Defendant if he was "under the influence of any narcotics, alcohol or mental or physical illness that prevents you from understanding what [the court] is saying", Defendant specifically answered, "No, sir," (DE # 48 at 11).

29.  The Court then asked Defendant if he was fully satisfied with the counsel, and

the representation and advice given to him in this case by his attorney, and Defendant said "Yes, sir." (DE # 48 at 11).

30.  The Court then told Defendant to tell him if he did not understand any questions and either he would explain, or Defendant could confer with his lawyer (DE # 48 at 17).

31.  In response to the Court's questioning, Defendant stated that he had had the opportunity to review the plea agreement with his attorney, that he understood the terms and provisions, that this was the whole agreement he had with the government, and that no one had made any other promises to him to convince him to plead guilty (DE # 48 at 11-12, 17-18).

32.  When Defendant said that he thought the government was going to withdraw the Section 851 enhancement, the Court, at attorney Horowitz's request, explained to Defendant what the consequences of the enhancement would be (DE # 48 at 12-15).  The Court explained to Defendant that he could plead guilty or withdraw his plea and go to trial, but this would be his final decision (DE # 48 at 15-16).  Specifically, the following colloquy occurred:

> THE COURT:  But you know, I don't want Mr. Clayton coming back tomorrow, next week, next month, or after he gets sentenced, and saying, one, that he didn't have enough time to think about it.  Two, that his lawyer made him do it.  Three, he wasn't understanding what it was he was doing.
>
> THE DEFENDANT: That's right, your Honor.
>
> THE COURT:  And four, that he wants to withdraw his plea and then go to trial.  So if - - Mr. Clayton, it's your decision.  They've offered you a plea agreement, and you can accept it; you can reject it.

THE COURT:  If you accept [the plea agreement], then you're not going to

have an opportunity in the future to come back and say I changed my mind.

If you reject it, today, then we'll just go to trial.  But it's - - this is your day,

but it's - - and it's your decision.  It's not your lawyer's decision.  It's your

decision.  So you know, if you need time to talk to your lawyer about, if you

don't want to accept the plea agreement, just tell me and we'll go to trial

(DE # 48 at 15-16).

Defendant responded, "Well, I don't want to go to trial, Your Honor." (DE # 48 at 16).

Defendant was then given time to talk to his lawyer.

33.  Horowitz again told Defendant that under the plea agreement, there would be

a ten year minimum sentence, and while Horowitz would do his best to have the

government withdraw the 851, he could not promise that it would happen.  After that,

Horowitz thought that Defendant understood the consequences of the enhancement, and

Defendant informed the Court that he had had a chance to talk to Horowitz (DE # 48 at

16-17).

34.  The Court then advised Defendant of the rights he was waiving by deciding to

enter his guilty plea, and Defendant stated that he understood (DE # 48 at 18, 20-21).

34.  The Court advised Defendant of the maximum possible penalties in his case,

and told him that the Court would decide the sentence (DE # 48 at 18-20).

35.  The Court advised Defendant of the meaning and effect of his appeal waiver,

and Defendant stated he understood (DE # 48 at 20)

37.  The government then provided a factual proffer concerning the evidence

against Defendant and the nature of the charges (DE # 48 at 21-23).  Defendant stated

that the government's evidence was correct (DE # 48 at 23-24).

36

38.  Finally, when the Court asked Defendant how he pleaded, Defendant said he did not understand, and asked to speak to attorney Horowitz (DE # 48 at 24).  Horowitz then asked Defendant whether he wanted to plead guilty or not, but did not tell Defendant what to do.  After speaking to Horowitz, Defendant pleaded guilty (DE # 48 at 24-25).

39.  Subsequently, Defendant agreed to be debriefed by the government.  Attorney Horowitz agreed with Defendant's decision.  On January 14, 2010, Defendant was debriefed.  Present were Defendant, Horowitz, the prosecutor, and two postal inspectors. Defendant said that on multiple occasions, Dread had paid him money to receive packages.  Defendant said Dread had given him between $80 and $100 per package, as well as some marijuana on occasion.  Defendant never knew what was in the packages, but assumed it was drugs.  Defendant had also purchased marijuana from Dread on prior occasions, some for personal use and some to sell.

40.  The undersigned Magistrate Judge finds that at the time Defendant decided to enter a plea of guilty, and during the subsequent plea hearing, Defendant was rational, competent, and understood what he was doing.  Defendant had the full and close assistance of experienced and effective counsel who had represented him during the investigation of this case, and Defendant was aware of the evidence against him. Defendant was not forced in any way to enter the plea, and made the decision to plead guilty knowingly, freely and voluntarily.  Based upon a review of the plea transcript, and a review of the record as a whole, the undersigned concludes that Defendant was competent at the time he entered the plea, and that he understood the proceedings.

41.  The undersigned further finds that Defendant's decision to seek withdrawal of his guilty plea was based upon a change of heart by Defendant after he saw the PSI, and

a desire to challenge the government's evidence against him, after the trial date had passed.

42.   The undersigned also finds that the interests of judicial economy will not be served by permitting the withdrawal of the plea.  The trial of this case was continued once at Defendant's request (DE ## 20-21), and the Court and the government were prepared to go forward with this matter as scheduled on January 11, 2010.  A jury panel had been summoned and was outside the courtroom, awaiting voir dire.

43.   Finally, the prejudice to the government lies in the dual trial preparation that will occur if Defendant is permitted to withdraw his plea, as well as the expense of bringing witnesses to Miami from out of town.  The government has not proven that the delay will prejudice its ability to prove its case, although it suggested that it might have trouble locating unspecified local witnesses.

IV.  <u>CONCLUSIONS OF LAW</u>

Rule 11(d) of the Federal Rules of Criminal Procedure provides that a defendant may withdraw a guilty plea "after the court accepts the plea, but before it imposes sentence if ... the defendant can show a fair and just reason for requesting the withdrawal." Fed. R.Crim. Pro. 11(d)(2)(B).  In determining whether a defendant has shown a "fair and just reason," the district court may consider the totality of the circumstances surrounding the plea, including the following factors: "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea." *Buckles,* 843 F.2d 469, 472 (11th Cir. 1988) (internal citations omitted).  The defendant has the burden of showing a "fair and just reason" for withdrawal of his plea.  *Id.* at 471.  Further, the good

38

faith, credibility and weight of a defendant's assertions are issues for the district court to decide.  *Id.* at 472.

It is clear from the record that Defendant enjoyed the close assistance of counsel. The undersigned credits the testimony of AFPD Farina and attorney Horowitz that they met frequently with Defendant, prepared a defense for him and explained the sentencing issues to him.  Attorney Horowitz came to court on January 11, 2010 prepared to go to trial.  Moreover, during the change of plea hearing, the court specifically addressed Defendant regarding the subject of his representation and Defendant stated, under oath, that he had fully discussed the indictment and plea agreement with attorney Horowitz and that he was fully satisfied with Horowitz's advice and representation of him.  The court is entitled to rely upon the veracity of these statements as "[t]here is a strong presumption that the statements made during the [plea] colloquy are true," *United States v. Medlock,* 12 F.3d 185, 187 (11th Cir.1994), and "when a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false." *United States v. Rogers,* 848 F.2d 166, 168 (11th Cir. 1988).  Because Defendant has not overcome the strong presumption of the veracity of his statements made under oath, the undersigned finds that Defendant enjoyed close assistance of counsel.

The undersigned also finds that Defendant's plea was knowing and voluntary. The District Court went into great detail during the plea colloquy.  For instance, during the plea colloquy, Defendant specifically stated, under oath, that he had reviewed with his attorney the elements of the offense, that he understood the agreement, that he agreed with the government's factual proffer, and that he understood the statutory maximum sentence.  As stated, there is a strong presumption of truth regarding these statements.  *Medlock,* 12 F.3d at 187.  The Court specifically warned Defendant, "If you

39

accept [the plea agreement], then you're not going to have an opportunity in the future to come back and say I changed my mind" (DE # 48 at 16).  Accordingly, the undersigned concludes that Defendant's plea was knowing and voluntary.

Furthermore, allowing Defendant to withdraw his guilty plea would not conserve resources of the court or of the parties.  The Court has already brought in a jury panel in preparation for trial.  The government had out-of-state witnesses, who were present and ready to testify on January 11, 2010, who would have to be brought back to Florida.  The government also asserts that there might be some difficulty in locating and subpoenaing some of the local witnesses (DE # 50 at 16).

The undersigned rejects Defendant's contentions that his attorney: 1) failed to render effective assistance of counsel; 2) failed to adequately review his case and his defense with him; 3) failed to spend adequate time with him in order to counsel and advise him regarding the facts and law of the case; 4) failed to properly advise Defendant of all the ramifications and consequences of a conviction after a trial versus a conviction after a plea; 5) failed to provide and adequately review the discovery with him; 6) failed to further any defense investigation; 7) failed to object to any post-arrest statement elicited from Defendant in violation of his constitutional rights; 8) failed to meet with him during the weekend just days before trial; 9) failed to adequately explain the potential application of the advisory guidelines and the career offender provisions as they might apply to Defendant; and 10) never reviewed any plea colloquy with Defendant or otherwise discussed or prepared Defendant for any plea proceeding (DE # 63 at 2-3, ¶4).

From the testimony of AFPD Farina and attorney Horowitz it is clear that:  1) Defendant was provided with effective assistance of counsel; 2) both counsel adequately reviewed his case and his defense with him; 3) both counsel spent adequate time with

40

him in order to counsel and advise him regarding the facts and law of the case; 4) attorney Horowitz properly advised Defendant of all the ramifications and consequences of a conviction after a trial versus a conviction after a plea, even though Defendant decided to plead at the last minute; 5) both counsel provided Defendant with discovery and adequately reviewed the discovery with him; 6) both counsel investigated the case; 7) while neither counsel objected to any post-arrest statement elicited from Defendant in violation of his constitutional rights, as there is no evidence of any post-arrest statement by Defendant; both counsel decided not to file a motion to suppress evidence gained through a consent search of Defendant's residence based upon after the interview with to Defendant's girlfriend, who gave the consent to search; 8) attorney Horowitz did not meet with Defendant during the weekend immediately before trial because Horowitz was preparing for trial, and Defendant had interrupted Horowitz's preparation on the Friday before trial by falsely claiming that he wanted to plead guilty; 9) both counsel fully explained, on numerous occasions the potential application of the advisory guidelines due to the career offender provision that Defendant was subject to, and the Section 851 enhancement, as they might apply to Defendant; and 10) attorney Horowitz prepared Defendant for the plea proceeding as much as he could before and during the colloquy, considering that Defendant came into court for a trial, and decided to plead guilty instead.

Therefore, based upon the totality of the circumstances, and the findings that Defendant had the lengthy and close assistance of counsel throughout this case, that the terms of the proposed plea agreement were thoroughly explained to him, that he understood the terms and consequences of the agreement, and that his plea was knowing and voluntary, the undersigned Magistrate Judge concludes that there is no

"fair and just reason" to permit withdrawal of the plea.  This case involves a change of heart by  Defendant, which did not occur until over two months after the entry of his plea, after the trial date had passed, and days after he received his PSI which set his guideline range at 262 to 327 months (DE # 50 at 17).  A guilty plea cannot be used to test the weight of the potential sentence.  *Rogers*, 848 F.2d at 168.

### VI.  CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, it is hereby

**RECOMMENDED** that Defendant's Motion to Compel, in which Defendant Charles Therion Clayton, *pro se*, seeks to vacate his guilty plea (DE # 43) and Defendant Charles Therion Clayton's Motion To Withdraw Guilty Plea and Request for Evidentiary Hearing (DE # 63), be **DENIED**.

The parties will have fourteen days from the date of service of this Order within which to file written objections, if any, for consideration by the Honorable K. Michael Moore, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc*., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in chambers in Miami, Florida on May 28, 2010

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable K. Michael Moore
        United States District Judge
All counsel of record